IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| George Andrako, *et al.*, | ) |
| Plaintiffs, | ) ) ) |
| vs. | ) Civil Action No. 07-1629 |
| United States Steel Corporation, | ) ) ) |
| Defendant. | ) ) |

AMBROSE, Senior District Judge

# OPINION AND ORDER OF COURT

Plaintiffs brought this collective action against their employer, Defendant United States Steel Corporation ("U.S. Steel" or "Defendant"), under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201, *et seq.* Currently, Plaintiffs seek compensation for time spent walking to and from their workstations after donning and before doffing (i.e., putting on and taking off) certain protective gear. Pending before me is Defendant's Motion to Decertify the Collective Action Under 29 U.S.C. § 216(b) (Docket No. 493). For the reasons set forth below, the Motion is denied.

## I. INTRODUCTION

### A. Factual History

Plaintiffs George Andrako, Mark Bruce, and John McCormick (the "named Plaintiffs") are hourly employees at a Clairton, Pennsylvania coke manufacturing plant owned and operated by Defendant U.S. Steel ("Clairton Coke Plant"). The approximately 1,250 production and maintenance employees at the Clairton Coke Plant, including the named Plaintiffs, are represented by the United Steelworkers of America, AFL-CIO-CLC ("USWA") and are members of USWA Local Union 1557.

1

Since November 30, 2004, U.S. Steel has operated up to five Clairton Coke Plant batteries, where coal is baked into coke that is used in steelmaking. The batteries are designated B Battery, 1-3 Battery, 7-9 Battery, 13-15 Battery, and 19-20 Battery. See Docket No. 52-1 (Declaration of Preston Henderson), ¶ 6. Under existing OSHA regulations, employees who work in a regulated area are required to wear protective clothing and shower at the conclusion of their work. See id. ¶¶ 26, 43-44. Employees who work, or who may work, in a regulated area include those who work in coke production at batteries, certain battery preservation employees, and some maintenance employees. See Docket No. 74 (Additional Declaration of Preston Henderson), ¶¶ 10-12.

Many employees who don, doff, and shower do so at one of three locker rooms located within the Clairton Coke Plant: the Maple locker room (near the Maple gate), the Wabash locker room (near the Wabash gate), and the centrally-located Women's locker room. See id. ¶ 17. At the beginning of their scheduled shifts, employees assigned to work on the batteries currently report to a nonregulated area such as a lunchroom or office, where they participate in a "safety huddle" to discuss various safety issues before beginning their production assignments for the shift. These mandatory safety huddles occur after the workers don their protective gear and walk to the area where they work and last from a few minutes up to 15 minutes. Following the safety huddle, workers proceed to their assigned work stations. After completion of their work duties, battery workers travel back from their assigned work stations to their locker rooms, where they doff and shower.

Coke production employees are regularly scheduled for one of three eight-hour shifts and are paid by the shift. Coke plant workers receive overtime compensation for hours worked in excess of eight in one day, even if they do not work in excess of 40 hours for the work week. Since as far back as 1947, U.S. Steel and the USWA have agreed that U.S. Steel would not pay employees for preparatory and closing activities such as donning, doffing, and walking to and

from work locations that occurred outside of the scheduled shift or away from the worksite. Henderson Decl. ¶¶ 36-37, 40, 43-45, 47, 56.  Since August 2008, the Basic Labor Agreement also has provided, through a Letter Agreement:  "Coke plant Employees who work in OSHA regulated areas and who are required to shower at the end of their shift will be provided with twenty (20) minutes wash-up time prior to the end of the Employee's shift, or a daily additive in an amount calculated at four-tenths (0.4) of an hour at the Employee's Base Rate of Pay, at the Company's choice."  Id. ¶¶ 42-45 and Ex. 7.  The 2008 Letter Agreement further provides that, except as to the prospective change regarding wash-up time, "the longstanding agreement regarding the non-compensability of portal-to-portal activities shall otherwise remain in effect." Id.

All employees at the Clairton Coke Plant swipe a card at the security gate through which they enter and exit the Plant on each day.  U.S. Steel's swipe system records the entry and exit times and records elapsed time spent within the plant.  Add. Henderson Dec. ¶ 16.  The swipe system is designed for and is intended to be a security system; it is not used to record hours actually worked.  Id.  U.S. Steel does not use a time clock or any other system to record an employee's actual time on the job, spell time, or lunch breaks.  See Docket No. 501-10 (2/5/09 Deposition of Preston Henderson), at 11.  The company uses a system called the T.I.M.E.S. system to track some employee information on a shift-by-shift basis, including swipe times, position codes, shifts worked, and hours paid, including overtime.  Add. Henderson Decl. ¶ 16.

**B. Procedural History**

On or about November 30, 2007, the Named Plaintiffs filed a Complaint against Defendant on behalf of themselves and all other similarly situated employees at the Clairton Coke Plant.  (Docket No. 1).  In relevant part, the Complaint alleges that Defendant violated the FLSA by failing to compensate employees for time outside their scheduled shifts spent donning, doffing, showering, and walking to/from their job locations after donning and prior to doffing.

3

Plaintiffs asserted their FLSA claim as a collective action pursuant to 29 U.S.C. § 216(b). On June 22, 2009, I issued an order entering partial summary judgment in favor of U.S. Steel, dismissing Plaintiffs' claims for time spent donning, doffing, and showering, but declining to dismiss Plaintiffs' claims for post-donning and pre-doffing walking time. (Docket No. 62). On September 2, 2009, I issued an order permitting this case to proceed as a section 216(b) collective action. (Docket No. 215). On September 15, 2009, I approved the parties' proposed Notice of Lawsuit with Opportunity to Join and authorized it to be sent to nearly 950 prospective "Opt-In Plaintiffs" whom Defendant believed had worked on OHSA-regulated areas dating back to November 2004. (Docket No. 227). My September 2, 2009 Order as well as the proposed Notice defined the collective action class as including:

> Current and former [Clairton Coke Plant] employees who have worked in OSHA-regulated areas, and were required to walk from the locker rooms to the plant after changing into their work clothes and walk to the locker rooms at the end of the work day to change out of their work clothes and shower.

Id. After the Notice was sent, 320 individuals signed consent forms to opt in as class members ("Opt-In Plaintiffs").

On December 17, 2009, I set parameters for the parties to conduct discovery on class- and merits-related issues and permitted Defendant to depose up to 50 of the individuals who had "opted-in" to the case. During the discovery period, 69 of the 320 Opt-In Plaintiffs were dismissed from the case either voluntarily or because they did not respond to deposition notices. At this juncture, 251 Opt-In Plaintiffs remain in the case in addition to the three Named Plaintiffs.

Now pending before the Court is Defendant's Motion to Decertify the Collective Action Under 29 U.S.C. § 216(b), which Defendant filed on June 18, 2010. (Docket No. 493). In its motion, Defendant seeks an order decertifying the collective action and dismissing without prejudice the claims of all Opt-In Plaintiffs. Id. Defendant argues that Plaintiffs are not "similarly

4

situated" because, inter alia, they have disparate factual and employment settings, there is no policy or practice that has a uniform impact on the class members, and there are numerous individualized defenses to the class members' claims. Plaintiffs oppose Defendant's Motion, arguing that they are similarly situated because they all are subject to a single uncontroverted unlawful pay practice, Defendant's defenses are either common defenses or otherwise do not warrant decertification; and one collective action will be more efficient and manageable than 254 individual trials. (Docket No. 500). Defendant filed a Reply Brief on August 9, 2010 (Docket No. 502), and Plaintiffs filed a Sur-Reply Brief on August 24, 2010 (Docket No. 508). After a careful review of the parties' submissions and for the reasons discussed in this opinion, Defendant's Motion is denied.

## II.     DECERTIFICATION

### A.     Legal Standards

The FLSA mandates employers to pay employees at least the minimum wage for all hours worked. 29 U.S.C. § 201, *et seq*. The FLSA permits employees to maintain a collective action under 29 U.S.C. §216(b) on their own behalf and on behalf of all similarly situated employees. Here, Plaintiffs seek to proceed collectively against Defendant under 29 U.S.C. § 216(b) for compensation for post-donning time spent walking to the production facilities at the beginning of the day and time spent returning to the lockers at the end of the day prior to doffing and showering. In relevant part, Section 216(b) authorizes collective actions against employers:

> by any one or more employees for and in behalf of himself or themselves and other employees similarly situated. No employee shall be a party plaintiff to any such action unless he gives his consent in writing to become such a party and such consent is filed in the court in which such action is brought.

29 U.S.C. § 216(b). Thus, the two requirements for maintaining a §216(b) class action are that employees are similarly situated and each class member file individual consent to opt-in. Sperling v. Hoffman La-Roche, Inc., 862 F.2d 439, 444 (3d.Cir.1988).

The FLSA does not define the term "similarly situated" and neither the United States Supreme Court nor the Court of Appeals for the Third Circuit provide direct guidance on determining whether potential class members are similarly situated. In the absence of definitive precedent, district courts in the Third Circuit have developed a two-stage test. Kuznyetsov v. West Penn Allegheny Health Sys., No. 09-CV-379, 2009 WL 1515175, at *1 (W.D. Pa. June 1, 2009) (Ambrose, J.). During the first or "notice" stage, the court determines whether a class should be conditionally certified for the purpose of notice to potential opt-in plaintiffs and for pretrial discovery regarding their individual claims. Id. (citing cases). In so doing, the court preliminarily determines whether the proposed class consists of similarly situated employees. Id. (citing Smith v. Sovereign Bancorp, Inc., No. 03-2420, 2003 WL 22701017, at *2 (E.D. Pa. Nov. 13, 2003)). Courts generally examine the pleadings and affidavits of the parties to decide whether the proposed class members are similarly situated, see Aquilino v. Home Depot, Inc., No. 04-4100, 2006 WL 2583563 at *1 (D.N.J. Sept. 7, 2006), and utilize a "fairly lenient" standard in rendering such a determination. Pontius v. Delta Fin. Corp., No. 04-1737, 2005 WL 6103189, at *3 (W.D. Pa. June 24, 2005); see also Kuznyetsov, 2009 WL 1515175, at *1; DeAsencio v. Tyson Foods, Inc., 130 F. Supp. 2d 660, 663 (E.D. Pa. 2001) (at first tier, plaintiffs have "fairly low burden" to prove similarly situated requirement). If the plaintiff meets the requisite showing, the class is conditionally certified for the purpose of notice and discovery. Kuznyetsov, 2009 WL 1515175, at *1. Once the class is conditionally certified, notice is given to the potential plaintiffs so that they may elect whether to opt-in to the action. Id.

In the second stage of class certification, after the court is more fully informed through discovery, the defendant may move to decertify the class on the basis that the "similarly situated" standard has not been met and the court makes its final certification decision. Sperling, 862 F.2d at 444; Kuznyetsov, 2009 WL 1515175, at *2; Pontius, 2005 WL 6103189, at *3. The burden of demonstrating that class members are "similarly situated" is significantly

higher at the decertification stage. See Moss v. Crawford & Co., 201 F.R.D. 398, 409 (W.D. Pa. 2000). Despite this higher burden, however, similarly situated does not mean "identically" situated. Wilks v. Pep Boys, No. 3:02-0837, 2006 WL 2821700, at *3 (M.D. Tenn. Sep. 26, 2006) (citing Moss, 201 F.R.D. at 409). Determining whether class members are similarly situated at the decertification stage generally requires consideration of three factors: (1) the disparate factual and employment settings of the individual plaintiffs; (2) the various defenses available to the defendant; and (3) fairness and procedural considerations. See Moss, 201 F.R.D. at 409; Lusardi v. Xerox Corp., 118 F.R.D. 351, 359 (D.N.J. 1987), mandamus granted in part, appeal dismissed, 855 F.2d 1062 (3d Cir. 1988), vacated in part, modified in part, 122 F.R.D. 463 (D.N.J. 1988), aff'd in part, appeal dismissed, 975 F.2d 964 (3d Cir. 1992).

The first factor assesses the opt-in plaintiffs' job duties, geographical location, supervision, and salary. Moss, 201 F.R.D. at 409. Generally, "allegations of an 'overarching' policy are insufficient, and plaintiffs are required to produce 'substantial evidence' of a 'single decision, policy or plan.'" Id. at 409-10 (quoting Thiessen v. Gen. Elec. Capital Corp., 996 F. Supp. 1071, 1081 (D. Kan. 1998)). The second factor concerns whether potential defenses apply to the opt-in class as a whole or whether many different defenses will be raised with respect to each individual opt-in plaintiff. Id. at 410. The third factor – fairness and procedural considerations – requires me to consider whether I can analyze the potential opt-in class with a "broad scale approach." Id. (quoting Lusardi, 118 F.R.D. at 360). In evaluating this factor, I must consider "that the primary objectives of a § 216(b) collective action are: (1) to lower costs to the plaintiffs through the pooling of resources; and (2) to limit the controversy to one proceeding which efficiently resolves common issues of law and fact that arose from the same alleged activity." Id. I also must determine whether I "can coherently manage the class in a manner that will not prejudice any party." Id.

At both the first and second stages, the burden is on plaintiffs to show that other

employees are similarly situated. Id. (quoting Bouaphakeo v. Tyson Foods, Inc., 564 F. Supp. 2d 870, 891 (N.D. Iowa 2008)). If the conditional group of plaintiffs does not meet its burden at the second stage, the court will decertify the group, dismiss the opt-in plaintiffs without prejudice, and permit any remaining plaintiffs to move on to the trial stage of litigation. See Lugo v. Farmer's Pride Inc., Civ. A. No. 07-0749, 2010 WL 3370809, at *7 (E.D. Pa. Aug. 25, 2010).

As set forth above, on September 2, 2009, I issued an order conditionally certifying Plaintiffs' FLSA claim as a collective action. (Docket No. 215). The present motion to decertify involves a stage two analysis. In conducting this analysis, I have reviewed the numerous pages of exhibits submitted in support of and in opposition to this motion. (Docket Nos. 494-496, 501).

**B.    Analysis**

**1. Factual and Employment Settings of the Individual Plaintiffs**

Defendant has presented extensive evidence in its multiple appendices regarding what it claims are the many insurmountable differences among Plaintiffs. Among other things, Defendant points to evidence that Plaintiffs had different work stations and/or jobs; took different walking routes; sometimes drove or got rides instead of walking; spent varying amounts of time engaged in non-work activities, paid meal breaks and spell time; and spent different lengths of time donning and doffing. Def.'s Br. Supp. at 22-23. Defendant claims that these differences show that Plaintiffs are not similarly situated and that decertification is therefore appropriate.

In response, Plaintiffs do not dispute that there are some disparate factual and employment settings. They argue, however, that these differences are not dispositive because all Plaintiffs are subject to the common and allegedly unlawful policy of non-payment for any post-donning and pre-doffing walking time that occurs outside of an employee's scheduled eight-hour shift. Plaintiffs contend that this common pay practice outweighs any factual or employment differences. Plaintiffs further note that they also share many similarities and that

many of the differences Defendants assert go to damages as opposed to liability. After careful consideration, I agree with Plaintiffs that this factor of the analysis weighs against decertification.

As an initial matter, Plaintiffs are correct that whether they were impacted by a "single decision, policy, or plan" is material to my analysis of the variations in Plaintiffs' factual and employment settings. <u>Wilks</u>, 2006 WL 2821700, at *3 (quoting <u>Moss</u>, 201 F.R.D. at 409-10)); <u>Jordan v. IBP, Inc.</u>, 542 F. Supp. 2d 790, 813 (M.D. Tenn. 2008). Numerous courts have held that the existence of such commonality "may assuage concerns about plaintiffs' otherwise varied circumstances." <u>Wilks</u>, 2006 WL 2821700, at *3; <u>see, e.g.</u>, <u>In re Tyson Foods, Inc.</u>, 694 F. Supp. 2d 1372, 1379 (M.D. Ga. 2010) (finding in donning, doffing, and walking time case that despite evidence purporting to show a litany of differences among plaintiffs, including evidence that some plaintiffs were already paid for some or all of such time, "Tyson's common practice of paying Plaintiffs by the mastercard method weighs heavily against decertification"); <u>Johnson v. Koch Foods, Inc.</u>, 657 F. Supp. 2d 951, 955-56 (E.D. Tenn. 2009) ("[I]n this case, the common policy or practice of paying plaintiffs by production line time is the factor that binds them together. Because of this common factor, the factual differences and the variations in plaintiffs' employment settings do not make this collective action improper."); <u>Kasten v. Saint-Gobain Performance Plastics Corp.</u>, 556 F. Supp. 2d 941, 946-47 (W.D. Wis. 2008) ("Regardless whether plaintiffs work in different areas, on different shifts and don and doff different amounts of required protective gear, they were subject to defendant's general practice of not compensating employees for donning and doffing certain protective gear and walking to work areas in violation of the FLSA."); <u>Moss</u>, 201 F.R.D. at 410 (plaintiffs' claim that they were subject to a common, unlawful practice trumped disparities in their employment situations at decertification stage); <u>Hill v. Muscogee County Sch. Dist.</u>, No. 4:03-CV-60, 2005 WL 3526669, at *3-*4 (M.D. Ga. Dec. 20, 2005) (same).

Here, it is undisputed that U.S. Steel and the Union have a longstanding agreement, applicable to all represented employees working in regulated areas, that any time spent outside an employee's eight-hour shift walking to and from the locker rooms after donning and prior to doffing protective gear is <u>not</u> compensated. Indeed, as noted in my opinion and order granting conditional certification, Defendant relied on this longstanding policy as the crux of a prior motion for summary judgment in which it unsuccessfully argued that the FLSA does not require Defendant to pay for such time. (Docket No. 48). As the Manager for Employee Relations for the Clairton Coke Plant, Preston Henderson, unequivocally declared in support of that motion, the 1947 national collective bargaining agreement provided that "the time employees spend in preparatory and closing activities was not compensable if such activities occurred outside of the scheduled shift or away from the worksite. Preparatory and closing activities covered by this agreement included the donning and doffing of work clothes, *walking to and from work locations*, and washing up." <u>Id.</u> ¶ 37 (emphasis added); <u>see also</u> <u>id.</u> ¶ 40 ("[T]he application of the 1947 Supplemental Agreement eliminated (and prevented) any practice or agreement that would result in payment for such activity (<u>e.g.</u>, preparatory and closing activities) . . . .").[1] Henderson further explained that, with the exception of a new 20-minute end-of-the-day washing-time provision set forth therein, the 2008 Letter Agreement acknowledged that the longstanding policy of non-compensability of portal-to-portal activities (including walking time) otherwise remained in effect. <u>Id.</u> ¶ 56, ¶¶ 43-45.

Defendant attempts to backtrack from this position in its motion to decertify by arguing that this admittedly common policy does not have a common impact on all employees. For example, Defendant points to deposition testimony and other record evidence that on certain

---

[1] <u>See also</u> Henderson Decl. ¶ 36 ("I am aware that, as far back as 1947, the Company and Union agreed . . . that the Company would not pay employees for such preliminary activities such as traveling, walking, and changing clothes."); ¶ 47 ("The observations . . . with respect to pre-shift activities apply equally to end of shift activities such as walking from the work site or changing out of work clothes. All such closing activities are not compensable at U.S. Steel by agreement, custom and practice.").

days, depending on the production schedule, some employees walk back to their locker room prior to the end of their scheduled shift and, therefore, are compensated for walking time. On other days, certain Plaintiffs' in-plant time equals their shift time and thus, their compensation on those days includes all in-plant activities. Defendant emphasizes that it does not have a policy of non-compensation for walking time that occurs during an employee's shift.

This argument not only smacks of disingenuity, it also misses the mark. Paying employees for walking time that happens to occur within their shifts is not equivalent to an affirmative policy of compensating employees for walking time. It simply means that Defendant pays employees for an eight-hour shift, regardless of what that time entails. As set forth above, it is undisputed that Defendant's longstanding policy is *not* to pay employees for the walking time at issue in this case – *i.e.*, *pre*- and *post*-shift walking time. The evidence before me does not show that Plaintiffs' walking time *universally* fell within shift time or otherwise was fully compensated.[2] Thus, whether or not a given plaintiff had compensated walking time on a given day is an issue of damages, not liability. See, e.g., Wilks, 2006 WL 2821700, at *7 (considering bifurcation of FLSA collective action into "a liability stage, where the parties could address the alleged existence of an impermissible policy or practice, and a damages one, where they could, if necessary, debate the *impact* of that policy or practice on individual plaintiffs" (emphasis added)). Again, Defendant's common policy of non-compensation for pre- and post-shift walking time weighs heavily against decertification even if some disparate factual and employment settings do exist.

Even considering the differences in factual and employment settings to which Defendant points (*e.g., inter alia*, differences in walking times, locker room locations, work locations, and

---

[2] To the extent Defendant nevertheless contends that a specific plaintiff (or plaintiffs) did not have *any* uncompensated pre- or post-shift walking time, the more appropriate procedural vehicle is a motion for summary judgment seeking dismissal of such plaintiff(s), not a motion to decertify the entire collective action.

shift-end times), I find that Defendant's concern with those differences is overstated in this case. As one court has aptly observed,

> If one zooms in close enough on anything, differences will abound; even for a single employee doing a single job, the amount of time that she spends donning and doffing on Monday will differ, at least minutely, from the amount of time that she spends donning and doffing on Tuesday. But plaintiffs' claims need to be considered at a higher level of abstraction.

Frank v. Gold'n Plump Poultry, Inc., No. 04-CV-1018 (PJS/RLE), 2007 WL 2780504, at *5 (D. Minn. Sep. 24, 2007); see also Jordan, 542 F. Supp. 2d at 813 (finding that the factual differences among meat processing plant plaintiffs in that case were "not so extreme as to require decertification" and reiterating that plaintiffs "need not be 'identically situated' to be considered 'similarly situated'"). Here, many of the differences to which Defendant points go to individual damages, not liability across the entire class. It is well-established that "[t]he fact that individualized findings regarding damages may be necessary does not require class decertification." Plewinski v. Luby's Inc., Civ. A. No. H-07-3529, 2010 WL 1610121, at *6 (S.D. Tex. Apr. 21, 2010); see also Kasten, 556 F. Supp. 2d at 957; Lugo v. Farmer's Pride Inc., __ F. Supp. 2d __, 2010 WL 3370809, at *10 (E.D. Pa. 2010).[3] Furthermore, Defendant downplays the many relevant similarities that Plaintiffs share. Among other things, all Plaintiffs are hourly employees who work at a single plant in either production or maintenance. All Plaintiffs

---

[3] In Lugo, the district court decertified a collective action in a donning, doffing, and walking case based on significant variations among plaintiffs that related to liability and damages and prevented a reliable determination of collective liability. Although Lugo was decided after the briefing on this motion was complete, Defendant cites it in separate briefing on another motion as supportive of decertification here. See Docket No. 513 at 4-7. I disagree. Critically, unlike the instant case, the company in Lugo did not have a common policy of non-compensation for donning, doffing, and walking time. 2010 WL 3370809, at **9-10, *18. To the contrary, the compensation system in Lugo affirmatively provided predetermined allowances for donning-and-doffing activities. Id. The Lugo plaintiffs did not contend that this pay practice was itself unlawful, but that it did not operate as claimed and/or undercompensated for the challenged time. Id. at *10. Because the undercompensation in Lugo was not suffered as a result of a "single decision, policy or plan," individual differences related not only to damages but also to whether each individual plaintiff was undercompensated at all. Id. at *10, *22. Due to the common policy of *non-*payment in this case, the individual differences are less important to liability than to damages. Moreover, to the extent Plaintiffs' varied circumstances are relevant to liability, the undisputed common practice of non-compensation overrides such concerns. For all of these reasons, the holding in Lugo is inapposite.

generally are scheduled for eight-hour shifts five days per week. All Plaintiffs work in OSHA-regulated areas and must wear protective clothing and gear within those areas. Generally, all Plaintiffs must report to a bath house and don their protective gear prior to traveling to their work stations to begin their shifts and to return to the bath house to doff that gear prior to leaving the plant at the end of the day. All Plaintiffs are represented by the same Union and are subject to the same BLA, including the longstanding practice of non-compensation for time spent walking between their work sites and the locker rooms before and after their eight-hour shifts. Finally, all Plaintiffs advance the same claim for relief – payment for that uncompensated walking time.

After careful review, I find that the differences in plaintiffs' factual and employment settings do not outweigh the above similarities or the commonality of the allegedly unlawful policy to which Plaintiffs claim to have been subjected. All of these reasons weigh heavily against decertification.[4]

### 2. Defenses Available to the Defendant

Defendant contends that it also has individualized defenses that cannot be tried on a class-wide basis. Defendant's argument that it will be unable to employ its various defenses or that individualized defenses will overwhelm the common issues in this case is weak. First, many of the asserted defenses such as the *de minimis* defense and the meal-break offset involve legal issues common to the class as a whole. See, e.g., Frank, 2007 WL 2780504, at *4 (*de minimis* defense raises legal questions susceptible of class-wide resolution, such as how much time is *de minimis* as a matter of law and what characteristics time must have before it can be considered *de minimis*); Def.'s Br. Opp. Mot. to Certify (Docket No. 188) at 7-8 (asserting that the meal-time issue could be decided on a summary judgment motion and describing the issue as case-dispositive and a controlling issue of law).

---

[4] The cases to which Defendant cites in its Reply Brief (Docket No. 502) do not persuade me otherwise. For the reasons set forth in Plaintiffs' Sur-Reply Brief (Docket No. 508), these cases either do not involve a common unlawful pay practice or are otherwise inapposite.

Second, many of the defenses to which Defendant points are not unique to a specific plaintiff. Rather, Defendant will assert similar defenses against most, if not all, class members, even if the application of the defenses will vary depending on individual circumstances. Nothing about the collective forum will prevent Defendant from employing these defenses. To the contrary, during trial, Defendant will be free to present evidence of lawful employment policies and practices, cross-examine individual representative plaintiffs, and to call others with material testimony helpful to Defendant's case. See Wilks, 2006 WL 2821700, at *7; Jordan, 542 F. Supp. 2d at 813-14. Moreover, requiring the court to apply similar defenses in 254 separate trials as opposed to against plaintiffs within the collective action hardly promotes efficiency. See, e.g., Moss, 201 F.R.D. at 411 (even though applicability of statute of limitations defense turned on background and knowledge of each individual plaintiff, performing the analysis in seventy separate lawsuits would be inefficient use of court's time); Frank, 2007 WL 2780504, at *4 (defenses did not defeat collective action even though application of defenses to different groups of plaintiffs would turn, in part, on facts that may vary among plaintiffs).

Finally, many of Defendant's alleged "individual" defenses relate primarily to damages – *i.e.*, how much uncompensated overtime Defendant allegedly owes to each Plaintiff. Again, the prospect of individualized damages defenses should not preclude collective adjudication of the critical issue in this case – whether Defendant employed "an improper practice that was formulated centrally and resulted in uncompensated overtime." Hill, 2005 WL 3526669, at *4. Not only does the alleged single policy or plan in this case outweigh any individualized defenses to damages, but such defenses can be managed easily and fairly, if necessary, through the use of bifurcation, subclasses, representative testimony, or other appropriate procedural mechanisms. See, e.g., Wilks 2006 WL 2821700, at *7 (discussing possibility of bifurcation of case into liability and damages phases); Plewinski, 2010 WL 1610121, at *7 (noting option of damages subclasses, quoting Kautsch v. Premier Commc'ns, No. 06-cv-04035-NKL, 2008 WL

14

294271, at *4 (W.D. Mo., Jan. 31, 2008)); Kasten, 556 F. Supp. 2d at 957 (subgroups could be created to address damages more efficiently).[5]

For all of the reasons set forth above, collective treatment will not leave Defendant unable to employ its various defenses, and the prospect of individual defenses does not otherwise outweigh collective liability.

### 3. Fairness and Procedural Considerations

To the extent Defendant argues that fairness and procedural considerations favor decertification, this argument is without merit. To the contrary, this factor weighs heavily in favor of Plaintiffs. Decertifying this case would potentially result in more than 250 individual trials, which not only is "the worst possible outcome in terms of efficiency[,]" but also would "place each opt-in Plaintiff back at square one without the benefit of pooled resources to resolve" the common liability questions in this case. Plewinski, 2010 WL 1610121, at **6-7 (quoting Kautsch, 2008 WL 294271, at *4); see also Wilks, 2006 WL 2821700, at *8 (where plaintiffs challenged same common pay practice, "any requirement that each plaintiff prove his or her claims individually would waste more judicial time and resources than trying their cases individually would preserve"). Such a result would be inimical to the policy behind collective actions under § 216(b) of the FLSA – i.e., "allowing plaintiffs to vindicate their rights by 'efficient resolution in one proceeding of common issues of law and fact' arising from the same improper

---

[5] I recognize that Plaintiffs attempt to assuage any concerns about differences in walking times and routes by relying heavily on the expert testimony of industrial engineer Bopaya Bidanda, Ph. D., who authored a report in which he applies a formula to calculate purported predetermined walking times from the various locker rooms to the various batteries. As set forth in my separate opinion and order dated March 9, 2011, I am granting Defendant's motion to strike Dr. Bidanda's testimony as it relates to the instant motion to decertify based on unreliability and lack of fit. That ruling, however, is not fatal to this collective action. As an initial matter, I do not need Dr. Bidanda's report to recognize the general principle that proper expert testimony regarding standard walking times might be relevant to damages calculations at that stage of the proceedings. See, e.g., Kasten, 556 F. Supp. 2d at 946-47 (denying motion to strike expert testimony that used standardized walking times to estimate uncompensated walking time). Moreover, as Plaintiffs note in their opposition brief and as set forth above, the parties may use other evidence such as, inter alia, representative testimony, other lay testimony, and/or company records to establish walking times and damages. See, e.g., *In re* Tyson Foods, Inc., 694 F. Supp. 2d at 1379-80.

practice." Plewinski, 2010 WL 1610121, at *7 (quoting Kautsch, 2008 WL 294271, at *4); see also Hill, 2005 WL 3526669, at *4; Johnson, 657 F. Supp. 2d at 956.  To the extent Defendant complains that decertification is necessary to protect its due process rights, "these rights must be balanced with the rights of the plaintiffs, many of whom likely would be unable to bear the costs of an individual trial, to have their day in court."  Wilks, 2006 WL 2821700, at *8; see also Bradford v. Bed Bath & Beyond, Inc., 184 F. Supp. 2d 1342, 1351 (N.D. Ga. 2002) ("As a practical matter, Plaintiffs can hardly be expected to pursue these small claims individually, so there is little likelihood that their rights will be vindicated in the absence of a collective action.").

With respect to procedural considerations, any perceived management difficulties Defendant raises do not outweigh Plaintiffs' interest in collective adjudication.  As set forth above, the court may resolve any such difficulties if and when they arise through bifurcation of liability and damages, the creation of subclasses, representative testimony, or other methods as the court deems appropriate.  As one court recently observed, similar cases that courts have permitted to go forward as collective actions have proceeded successfully to trial or other satisfactory resolution, further indicating that Defendant's concerns are exaggerated and that I can coherently manage the class in a way that will not unfairly prejudice either party.  See In re Tyson Foods, Inc., 694 F. Supp. 2d at 1380 (citing cases).

### III.     CONCLUSION

For all of the reasons set forth above, Defendant's Motion to Decertify the Collective Action Under 29 U.S.C. § 216(b) (Docket No. 493) is denied.

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| George Andrako, *et al.*, | ) |
| --- | --- |
| Plaintiffs, | ) |
| vs. | ) Civil Action No. 07-1629 |
| United States Steel Corporation, | ) |
| Defendant. | ) |

AMBROSE, Senior District Judge

And now, this 9th day of March 2011, it is ordered that Defendant's Motion to Decertify the Collective Action Under 29 U.S.C. § 216(b) (Docket No. 493) is denied.

It is further ordered that the parties shall jointly file within ten (10) days of the date of this order, a proposal for any further proceedings, including any additional discovery that may be necessary before trial, as set forth in paragraph 6 of my order of court dated December 17, 2009 (Docket No. 419).

A Case Management/Settlement Conference is set for Monday, April 11, 2011 at 10:15 a.m. in Courtroom 3B. All counsel shall bring their calendars to the conference for scheduling purposes. The parties should be prepared to discuss settlement.

BY THE COURT:

/s/ Donetta W. Ambrose
Donetta W. Ambrose
Senior U.S. District Judge