IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| George Andrako, *et al.*, | ) |
| Plaintiffs, | ) ) ) |
| vs. | ) Civil Action No. 07-1629 ) |
| United States Steel Corporation, | ) ) |
| Defendant. | ) ) ) |

AMBROSE, Senior District Judge

## **OPINION AND ORDER OF COURT**

The factual and procedural details of this case are well known to the parties and I need not repeat them in detail here. In short, Plaintiffs brought this collective action against their employer, Defendant United States Steel Corporation ("U.S. Steel" or "Defendant"), under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201, *et seq.* Currently, Plaintiffs[1] seek compensation for time spent walking to and from their workstations after donning and before doffing (i.e., putting on and taking off) certain protective gear at a Clairton, Pennsylvania coke manufacturing plant owned and operated by U.S. Steel ("Clairton Coke Plant").

Plaintiffs offer the expert testimony of Bopaya Bidanda, Ph.D ("Bidanda"), an industrial engineering professor at the University of Pittsburgh, with respect to standard walking times from locker rooms to batteries at the Clairton Coke Plant. Pending is Defendant's Motion to Strike Opinions and Testimony of Bopaya Bidanda, Ph.D (Docket No. 503) based on Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579 (1993) and its progeny. I held a hearing on the motion on September 13, 2010, and the parties submitted both pre- and post-hearing briefs and

---

[1] At this juncture, 251 Opt-In Plaintiffs remain in the case in addition to the three Named Plaintiffs, George Andrako, Mark Bruce, and John McCormick.

1

exhibits. (Docket Nos. 504, 506, 513, 514). After carefully considering the submissions of the parties and the evidence presented at the hearing, the motion is granted for purposes of the Defendant's pending Motion to Decertify only as set forth more fully below.

### I. Analysis

#### A. *Daubert* Standard and Rule 702

In Daubert, the Supreme Court held that:

> [f]aced with a proffer of expert scientific testimony, ... the trial court judge must determine at the outset ... whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue. This entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue.

509 U.S. at 592-93. Subsequently, in Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 141 (1999), the Supreme Court clarified any confusion regarding the intended reach of the Daubert decision, by declaring that the trial judge must perform this "basic gatekeeping obligation" to all expert matters, not just "scientific" matters. In the Third Circuit, the trial court's role as a "gatekeeper" announced in Daubert requires proof that: (1) the proffered witness is qualified as an expert; (2) the expert must testify about matters requiring scientific, technical, or specialized knowledge; and (3) the expert's testimony must "fit" the facts of the case. In re Paoli R.R. Yard PCB Litig., 35 F.3d 717, 741-42 (3d Cir. 1994). Thus, pursuant to Daubert, the gatekeeping function requires the court to ensure that the expert testimony is both reliable and relevant. Daubert, 509 U.S. at 589; Kumho Tire Co., 526 U.S. at 147.

As to the first requirement - qualification - the Court of Appeals for the Third Circuit has "eschewed imposing overly rigorous requirements of expertise and [has] been satisfied with more general qualifications." Paoli, 35 F.3d at 741. "Rule 702's liberal policy of admissibility extends to the substantive as well as the formal qualification of experts." Id. Thus, an expert can qualify based on a broad range of knowledge, skills, training and experience.

2

The second inquiry focuses on methodology. The inquiry into methodology is designed to ensure that an expert's opinions are based upon "'methods and procedures of science' rather than on subjective belief or unsupported speculation; the expert must have 'good grounds' for his or her belief." Id. at 742. Factors used to assess reliability may include whether: (1) the theory or technique can be tested; (2) the theory or technique has been peer reviewed; (3) there is a high rate of known or potential error; (4) there are standards or controls; (5) the theory is "generally accepted"; (6) there is a sufficient relationship between the technique and methods which have been established to be reliable; (7) the expert's qualifications are sufficient; and (8) the method has been put to non-judicial uses. See Magistrini v. One Hour Martinizing Dry Cleaning, 180 F. Supp. 2d 584, 594 (D.N.J. 2002), aff'd, 68 F. App'x 356 (3d Cir. 2003). "Some courts also consider additional factors relevant in determining reliability, including: (i) whether the expert's proposed testimony grows naturally and directly out of research the expert has conducted independent of the litigation . . . ; (ii) whether the expert has unjustifiably extrapolated from an accepted premise to an unfounded conclusion. . . ; (iii) whether the expert has adequately accounted for alternative explanations . . . ; (iv) whether the expert is being as careful as he would be in his professional work outside of the litigation context . . . ; and (v) whether the field of expertise asserted by the expert is known to reach reliable results for the type of opinion proffered by the expert . . . ." Id. at 594-95 (citations omitted); see also Cuffari v. S-B Power Tool Co., 80 F. App'x 749, 751 (3d Cir. 2003) ("In short, trial courts should determine whether the expert's conclusion is based on valid reasoning and reliable methodology.").

Although this list of factors is lengthy, not each factor will be relevant to every reliability analysis. The "test of reliability is 'flexible.'" Kumho, 526 U.S. at 141. According to the Supreme Court, "Daubert's list of specific factors neither necessarily nor exclusively applies to all experts." Id. The relevance of the Daubert factors depends "on the nature of the issue, the

expert's particular expertise, and the subject of his testimony." Id. at 150 (internal quotation marks and citations omitted).

Finally, Daubert and Rule 702 require that the expert's testimony "fit" the facts of the case. "'Fit'" requires that the proffered testimony must in fact assist the jury, by providing it with relevant information, necessary to a reasoned decision of the case." Magistrini, 180 F. Supp. 2d at 595 (citing Paoli, 35 F.3d at 743).

### B. The *Daubert* Motion

Bidanda's proposed expert testimony serves two purposes. First, in his initial expert report dated February 25, 2010, Bidanda used direct measurements and a predetermined motion time system, MOST [which stands for "Maynard Operation Sequence Technique"], to estimate average walking times from the three locker rooms to the five coke oven batteries at the Clairton Coke Plant. Second, Bidanda opined at the end of his initial report and in a March 22, 2010, supplemental letter that the next logical step would be to establish the time workers spent in the plant and compare it to the amount paid to each worker. He also stated that U.S. Steel's payroll data "may easily be converted into a computer readable format" allowing such a calculation to be made. In a declaration dated July 20, 2010 – well after the close of expert discovery and Bidanda's deposition -- Bidanda purports to have determined and applied a methodology for analyzing which of the Named and Opt-In Plaintiffs have uncompensated pre- or post-shift time and, if so, the amount of uncompensated walking time.[2]

Defendant argues that I should exclude Bidanda's proposed expert testimony in its entirety at the decertification stage under Daubert and its progeny. Specifically, Defendant

---

[2] A copy of Bidanda's Expert Report ("Report") is attached as Exhibit A to Defendant's Motion to Strike. (Docket No. 503-1). A copy of the March 22, 2010 supplemental letter ("Supplemental Letter") is attached as Exhibit B. (Docket No. 503-2). Defendant attached a copy of Bidanda's July 20, 2010 Declaration ("Bidanda Decl.") as Exhibit D to the Motion to Strike. (Docket No. 503-4). In connection with their opposition to Defendant's separately filed Motion for Decertification, Plaintiffs filed a corrected version of Bidanda's Declaration correcting several typographical errors in paragraphs 23 and 32. (Docket No. 509).

argues that Bidanda's opinions do not satisfy Daubert's "fit" requirement and/or that the opinions are unreliable because Bidanda's data and methodology were flawed and incomplete. Plaintiffs disagree that Bidanda's testimony is either irrelevant or unreliable and argue that the testimony should be admitted at the decertification stage for the limited purpose of showing that predetermined walking times can be applied to remedy Defendant's violations of the FLSA and that this case can and should still proceed as a collective action. After careful consideration of the hearing testimony, the parties' written submissions, and the other evidence of record, I agree that Dr. Bidanda's proposed expert testimony should be stricken for purposes of deciding Defendant's Motion for Decertification (Docket No. 493).

As an initial matter, I share Defendant's concerns regarding the reliability of Bidanda's methodology. Like Defendant, I do not find any reason to question the MOST system *per se*, but Bidanda's application of that system in this case raises significant doubts. Among other things, Bidanda admits that he made an "unfortunate error" in his report by "accidently" equating one second to 25.4 Time Measurement Units ("TMU"s) when, in fact, the correct value is 27.8 TMUs. See Transcript (Docket No. 512) at 41.[3] Bidanda also unilaterally increased the TMU multiplier upward from 15 TMUs (the Method-Time Management ("MTM") value for unobstructed walking) to 20 TMUs. Id. at 40. Although MOST is based on MTM data, and the relevant MTM data card indicated that the multiplier might bump up to 17 if the walking is obstructed or the individual is carrying significant weight, Bidanda nevertheless "made a judgment" to use the number 20 "based on the kind of safety clothes and the kind of boots people were wearing." Id.

---

[3] To calculate the average walking times set forth in his report using the MOST system, Bidanda: (1) took the measured distance in feet between a locker room and a battery and divided it by 2.5 (average feet in a human step) to get the average number of steps taken by an employee traveling between a locker room and a battery, not including stairs; (2) added the number of stairs (one stair = one step); (3) multiplied that sum by 20 (his estimate of the appropriate TMUs for the walking at issue); (4) divided that total number of TMUs by 25.4 (although the correct value is 27.8; 27.8 = 1 second) to arrive at the total number of seconds spent walking between a locker room and a battery; and (5) divided the total number of seconds spent walking between a locker room and a battery by 60 to arrive at the minutes spent walking between a locker room and a battery. Transcript at 39-47.

5

at 39-42; see also id. at 44 (testifying that he bumped the number to 20 "because I thought that was the appropriate thing to do"); id. at 52 (opining that one cannot walk in full stride in the required flame-retardant safety clothes and boots); id. at 64.[4]  As opposed to the published and apparently widely-accepted MOST and MTM data to which Bidanda refers in his report, there is no evidence that the 20 multiplier Bidanda ultimately used or his method of selecting that number was "generally accepted" or otherwise reliable.[5]  To the contrary, it appears that Bidanda "unjustifiably extrapolated from an accepted premise to an unfounded conclusion."

In addition to the above flaws in his methodology, Bidanda admits that he did not review any deposition transcripts, interview any of the Plaintiffs, or observe or time any employees actually walking the distances at issue.  As Defendant notes, many of the estimated walking times to which the deposed Plaintiffs testified vary significantly from Bidanda's numbers.  Although I agree that such data is not required to perform a MOST analysis, in this context, the discrepancies coupled with Bidanda's failure to explain them in his report casts further doubt on the reliability of his method.

In short, for the above reasons, I agree with Defendant that at this stage of the proceedings, the calculations at issue are not "sufficiently reliable so that [they] will aid the [fact-finder] in reaching accurate results."  Def.'s Br. at 9-10 (quoting Bauer v. Bayer A.G., 564 F. Supp. 2d 365, 375 (E.D. Pa. 2008)).

---

[4] Bidanda later testified at the hearing that he actually decided to use another appendix ("Appendix B") that stated that 18 TMUs was the correct number for the type of unobstructed walking at issue here and then increased that number to 20 to account for the safety clothing and boots.  Transcript at 51-53; 63-64.  In his deposition taken months prior to the Daubert hearing, Bidanda could not remember why he used the number 20.  Bidanda Dep. (Docket No. 503-3) at 45-46.  Neither Bidanda nor Plaintiffs have pointed to any published source listing 20 as an accepted multiplier.

[5] Although Bidanda claims to have used his "professional judgment" in increasing the multiplier due to the safety clothing, there is no evidence he has any special expertise in the safety clothing at issue or had any experience with such clothing other than wearing it during his one-day visit to the plant.  Tr. at 52-53.

Even if, standing alone, the above reliability issues would survive a <u>Daubert</u> challenge, Bidanda's opinions at this juncture of the proceedings also suffer from a lack of "fit." The issue before me at the decertification stage is whether Plaintiffs are "similarly situated." For the reasons set forth in my separate Opinion and Order dated March 9, 2011 denying Defendant's Motion for Decertification, Plaintiffs have demonstrated that they are sufficiently "similarly situated" to continue to proceed as a collective action. As further explained in that Opinion, Bidanda's testimony was unnecessary to reach that conclusion. As Plaintiffs recognize, expert testimony such as Bidanda's would become relevant primarily at the damages phase of this litigation to show a reasonable estimate of time expended on walking. To the extent Plaintiffs rely on Bidanda's testimony here only to show that predetermined walking times *can be* applied at the damages stage, thus alleviating Defendant's concerns that individualized damages inquiries will swamp the common issues in this case, I do not need actual expert testimony in order to acknowledge this as a valid point. I recognize that courts have admitted similar testimony in other FLSA collective actions and do not rule out the possibility that reliable expert testimony concerning predetermined walking times would become relevant at trial on damages in this case. <u>See, e.g.</u>, <u>Kasten v. Saint-Gobain Performance Plastics Corp.</u>, 556 F. Supp. 2d 941, 946-47 (W.D. Wis. 2008) (allowing defense expert whose report relied upon standardized walking times and finding that the opinions "could help the finder of fact in determining how much time plaintiffs were working without being compensated").

Because Bidanda's testimony as to specific predetermined walking times and methods of calculating damages is not necessary to my analysis at the decertification stage, Defendant's motion to strike that testimony is granted.[6] I make no ruling as to the admissibility of Bidanda's testimony in a revised form at trial.

---

[6] With respect to the portion of Bidanda's proposed testimony belatedly set forth in his July 2010 Declaration (concerning his proposed methodology for analyzing which of the Named and Opt-In Plaintiffs

___

have uncompensated pre- or post-shift time), such testimony is also unnecessary to my ruling on decertification.  Although Bidanda's declaration was inexcusably submitted after the close of expert discovery and after Bidanda's deposition, I note that Defendant had the opportunity to cross-examine Bidanda on the opinions contained therein at the <u>Daubert</u> hearing. I make no ruling as to the admissibility or the usefulness of the contents of the declaration at trial.

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| George Andrako, *et al.*, | ) |
| Plaintiffs, | ) |
| vs. | ) Civil Action No. 07-1629 |
| United States Steel Corporation, | ) |
| Defendant. | ) |

AMBROSE, Senior District Judge

And now, this 9th day of March 2011, Defendant's Motion to Strike Opinions and Testimony of Bopaya Bidanda, Ph. D. (Docket No. 503) is granted, and Dr. Bidanda's opinions and testimony are stricken for purposes of Defendant's Motion for Decertification only.

BY THE COURT:

/s/ Donetta W. Ambrose
Donetta W. Ambrose
Senior U.S. District Judge